

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

December 17, 2025

**BY ECF & EMAIL**

The Honorable Sidney H. Stein
    United States District Judge
The Honorable Sarah Netburn
    Chief United States Magistrate Judge
The Honorable Gary Stein
    United States Magistrate Judge
Southern District of New York
New York, New York 10007

      Re: *United States v. Brian Gonzalez, et al.,* **25 Cr. 576 (SHS)**

Dear Judge Stein, Chief Magistrate Judge Netburn, and Magistrate Judge Stein:

      In advance of the presentments that are expected to occur later today, the Government respectfully submits this letter to provide the Court and defense counsel with a summary of the charges in the above-captioned Indictment and the basis for the Government's motion for pretrial detention for each defendant. All of the defendants are charged with conspiring to distribute cocaine base ("crack"), fentanyl, heroin, and cocaine, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A), (B) & (C), and related firearms offenses, in violation of 18 U.S.C. §§ 924(c) and 2. They are thus eligible for detention—and in fact subject to a rebuttable presumption in favor of detention—under 18 U.S.C. § 3142(e)(3)(A) and (B). The Government submits that each defendant should be detained, as no condition or combination of conditions will reasonably assure his appearance as required and the safety of the community.

## I.    Introduction

      Many apartment buildings across New York City have businesses on the ground floor. For lucky residents in most neighborhoods, those businesses are licensed commercial establishments, like delis, pizzerias, banks, and bakeries, which enhance the surrounding community. For too many unlucky residents, however—especially those in public housing complexes run by the New York City Housing Authority ("NYCHA")—the businesses that haunt their buildings are illicit narcotics operations that diminish and degrade public spaces that are meant to be shared by thousands of law-abiding tenants, including children and the elderly.

      The James Weldon Johnson Residential Community (often called the "Johnson Houses") in East Harlem is just such a housing complex. For at least three and a half years, one of the Johnson Houses buildings at Park Avenue and East 115th Street (the "Building") has been exploited by at least a dozen men who have operated a bustling drug market. These 12 men—the

defendants in this case—have brazenly sold fentanyl, crack cocaine, and other narcotics to countless drug users who have streamed, every day, into the Johnson Houses for the sole purpose of buying the group's poisonous drug product. The defendants have used the Building lobby, stairwells, and mailboxes to conduct business, and they have spread into the Building courtyard and even the children's playground in the middle of the Johnson Houses complex.



The Johnson Houses (circled in **red**) are just about four blocks northeast of the northeast-most tip of Central Park (circled in **blue**).



In addition to attracting drug customers who are suffering from addiction and other harms of illicit drug use, the defendants also brought street rivalries, guns, and violence to the Johnson Houses. For example, through rap music videos and social media posts that glorify violence, members of the conspiracy engaged in a senseless back-and-forth conflict with residents of the

neighboring Jefferson Houses.  Members of each group would then film themselves walking through (or "spinning") the other's complex until they found each other and exchanged gunfire in broad daylight, in populated residential areas.

Members of the conspiracy also possessed guns for other reasons, including to protect against robberies of their drugs and drug proceeds, and they would store firearms in communally accessible places, like Building utility boxes.  All of the defendants participated in this conspiracy, despite the very obvious and public gun possession and violence that accompanied it, in addition to the well-known harms of fentanyl and crack cocaine abuse in their community.

The facts described below come from, among other sources, approximately 45 audio- and video-recorded controlled drug buys that New York City Police Department ("NYPD") undercover officers ("UCs") made from the defendants (all in and around the Building), surveillance at and around the Johnson Houses, surveillance in and around the Building, evidence obtained from searches of social media accounts and cellphones, law enforcement records of past arrests and seizures, and information obtained from a confidential human source ("CHS") with personal knowledge of the Johnson Houses and the Building drug operation in particular.

## II.    Procedural Background

On December 12, 2025, a grand jury sitting in this District returned a two-count Indictment charging all twelve defendants with **[1]** conspiring to distribute 280 grams or more of cocaine base ("crack"), 40 grams or more of fentanyl, and quantities of heroin and cocaine, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A), (B) & (C), and **[2]** using or carrying firearms during and in relation to, or possessing firearms in furtherance of, a drug-trafficking crime, and aiding and abetting the same, in violation of 18 U.S.C. §§ 924(c) and 2.  Based on the charges, all of the defendants are eligible for detention under numerous provisions of 18 U.S.C. § 3142(f)(1) and (2), and they are subject to a rebuttable presumption in favor of detention under 18 U.S.C. § 3142(e)(3)(A) and (B).

Late last night and this morning, eight defendants were arrested and are expected to be presented this afternoon on the charges in the Indictment.[1]  Defendant BRYAN COWAN is currently serving a state sentence and will be brought into the District by writ at a later date.  Three defendants (HOPWAH, JONES, and FARQUHARSON) remain at liberty.  Simultaneously with the arrests, law enforcement executed search warrants at the following locations and seized the following items, among other things: (1) **a Building "stash" apartment**: five firearms, two of which were "long" guns, capsules, bags, and baggies sof suspected narcotics, and various drug paraphernalia and mixing material; (2) **NIN's apartment**: one firearm, one magazine, and two boxes of ammunition; (3) **HOPWAH's apartment**: ammunition, suspected crack, and drug paraphernalia ; and (4) **CAESAR HERNANDEZ's apartment**: a large bag of suspected cocaine, a gun-cleaning kit, and a .40-caliber shell casing.[2]

---

[1] CARRION had previously been arrested on narrower drug and firearm offenses charged in Complaint 25 Mag. 3289.  He was released on conditions that included home incarceration, and he was arrested at his home this morning.

[2] **BOYCE's apartment** was also searched and agents seized only baggies of marijuana, various electronic devices (*i.e.*, a phone and tablets), and assorted credit/debit and ID cards.

III.    **The Defendants' Armed Drug Market in the Johnson Houses[3]**

Between March 2022 and December 2025, NYPD UCs made approximately 45 controlled drug buys (hereinafter "buys") from one or more of the defendants, most of which occurred in the Building lobby or stairwell, with some also in the Building courtyard and at a Johnson Houses playground.  Audio and video recordings of the buys captured clear images of the defendants' faces as they sold their illicit product, including the sample photographs provided below.  During many of the buys, multiple defendants were present, often acting as lookouts, counting money, handling product or paraphernalia, and/or making sales to other customers.  The evidence against each defendant on Count One is, the Government submits, irrefutable.



*BRIAN GONZALEZ*
*(May 15, 2025 buy)*

*BRIAN NIN*
*(June 6, 2025 buy)*

*BRYAN COWAN*
*(July 7, 2022 buy)*

*JAFFARI HOPWAH*
*(Sept. 18, 2025 buy)*

*IRA BOYCE*
*(Aug. 11, 2022 buy)[4]*

*JOSE HERNANDEZ*
*(June 9, 2022 buy)*

---

[3] As discussed in Part IV, the Government understands that Pretrial Services will not consider many of the facts in this Part when recommending release or detention.  Because this information all must be considered under the Bail Reform Act—and counsels in favor of detention—the Government submits that Pretrial recommendations for release should be given limited weight.

[4] Brightness and contrast of this screenshot are increased.



*DANIEL JONES*
*(Aug. 11, 2022 buy)[5]*



*JAHDEEN WILLIAMS*
*(Aug. 27, 2025 buy)*



*RICHARD FARQUHARSON*
*(Nov. 30, 2022 buy)*



*PERCY CARRION*
*(Sept. 18, 2025 buy)*



*CAESAR HERNANDEZ*
*(Jan. 4, 2024 buy)*



*QUADIR DAVONISH*
*(Jan. 17, 2025 buy)*

And while many of the controlled buys were for relatively small, personal use quantities of narcotics,[6] there is also dispositive evidence that the defendants sold vastly greater amounts of the drugs. First, the UCs made buys over an extended time period, nearly four years, during which members of the conspiracy were consistently available in the Building and ready to sell. In addition, they did not have just enough product to sell to the UCs; they also had fanny packs and other bags full of product to be sold to other customers. The UCs in fact observed these defendants' supplies, some of which were even caught on video as a defendant picked out the

---

[5] Brightness of this screenshot is increased.

[6] In order to identify as many members of a conspiracy as possible, UCs often pose as drug users who purchase small quantities at a time, not as resellers who would purchase multiple grams to be repackaged and sold again. This is because once a UC buys significant weight from one dealer (which often requires establishing a one-on-one relationship with that dealer), he can no longer credibly or safely approach the field of street-level dealers for personal use amounts. In this case, once a UC began buying tens of grams of crack from BRIAN NIN, he could not go back to posing as a drug user passing through the lobby.

individual bags or capsules that the UC was buying at the time. Moreover, the UCs saw, and their recording devices captured, the defendants making sales to other customers, further confirming the extent of the drug operation being run from the Building. Lastly, in or about June 2025, one of the UCs began purchasing tens of grams of crack and fentanyl from BRIAN NIN, which confirmed that the conspiracy had ready access to such large quantities. Indeed, in just 13 transactions, the UC purchase approximately 300 grams of crack and 40 grams of fentanyl, including in the Building lobby and stairwell in the presence of other co-conspirators, including HOPWAH, WILLIAMS, and CARRION. Taking these facts together, there is no doubt whatsoever that members of the conspiracy, individually and in the aggregate, sold *far* more than the charged statutory thresholds of 280 grams of crack and 40 grams of fentanyl.

Another fact renders the defendants' drug business highly troubling: on at least two occasions (and potentially others for which further laboratory testing is needed), the substance that one of the defendants sold was not in fact heroin or even fentanyl, but rather a "nitazene"—*i.e.*, another category of synthetic opioid, but one that is "even more powerful than fentanyl." Ruben Castaneda, "What Are Nitazenes?" *U.S. News & World Report* (May 26, 2022).[7] Nitazenes have begun to attract widespread attention, and for good reason:

> Pharmacological research has found that many nitazenes have an exceptionally powerful effect. Although they bind to and selectively activate the same receptors as fentanyl and morphine (the mu receptors), they do so with an **efficacy that is 60 times greater than fentanyl**. They also activate these receptors with considerably greater strength. Some analogues are up to 10 times stronger than fentanyl, or 100 times more potent than morphine. **This high potency can have dramatic implications for public health – even tiny amounts (nanograms per millilitre) can be lethal.**

Elena Escubedo Rafa, "10 times stronger than fentanyl, nitazenes are the latest, deadly development in the synthetic opioid crisis," *The Conversation* (Sept. 24, 2025) (emphases added).[8]

---

[7] https://health.usnews.com/drugs/articles/nitazenes. *See also* Jeffrey A. Singer et al., "These New Synthetic Opioids Could Make the Fentanyl Crisis Look like 'The Good Old Days'," CATO Institute (Jan. 23, 2024), https://www.cato.org/commentary/these-new-synthetic-opioids-could-make-fentanyl-crisis-look-good-old-days ("A recent study of **metonitazene**, a closely related drug, found it took three doses of the opioid overdose antidote naloxone to treat a metonitazene overdose, compared with one dose for fentanyl. In a couple of cases, even three doses were insufficient to save the users' lives, leading the authors to conclude that 'metonitazene appears to have the most severe clinical toxicity' of nitazenes they detected in overdose toxicology studies." (emphasis added)); Carlos Granda, "New synthetic drug three times stronger than fentanyl linked to LA County death," ABC7, https://abc7.com/post/what-is-protonitazene-new-synthetic-opioid-times-stronger-fentanyl/15678958/ ("A new synthetic drug considered three times more powerful than fentanyl is being blamed for at least one death in Los Angeles. **Protonitazene** is so potent, the Food and Drug Administration never approved it." (emphasis added)).

[8] https://theconversation.com/10-times-stronger-than-fentanyl-nitazenes-are-the-latest-deadly-development-in-the-synthetic-opioid-crisis-265882.

Such deadly substances—specifically metonitazene and protonitazene—appeared in substances purchased by a UC from CAESAR HERNANDEZ on May 5, 2023 and NIN on July 25, 2023.

As noted above, moreover, the conspiracy's drug supply often came from a "stash" apartment within the Building.  When searched this morning, law enforcement found five guns—including a shotgun and scoped rifle—and multiple rounds of ammunition, pictured below:












The defendants' criminal histories, prior law enforcement encounters, and involvement in gun possession and violence further reflect the deleterious impact they have had on the community, even while under various forms of court supervision.[9]

1. **BRIAN GONZALEZ:**  At 33 years old, GONZALEZ has sustained **approximately ten arrests** since September 2008 (six of which have been sealed), and he has sustained three felony convictions, possessed a firearm, and encouraged violence by younger members of the conspiracy. GONZALEZ was on pre-trial release during at least some of the offense conduct in this case.

   o  In September 2008, GONZALEZ was arrested for second-degree robbery after he forcibly stole property from a victim on Park Avenue.  While released on his own

---

[9] Arrest totals and charges listed below are all based on NYPD records and therefore include only those that occurred in New York City.  Convictions include any throughout all of New York State.

recognizance prior to sentencing, he was arrested again in April 2009. In July of that year, he **pled guilty** to petit larceny and grand larceny, and in December which he was sentenced to one year in prison.

o   In September 2010, GONZALEZ was arrested on a charge of attempted murder stemming from an incident in which he and NIN approached a victim on Lexington Avenue in the Johnson Houses, GONZALEZ punched the victim in the face, and NIN shot the victim in the buttocks. In December of that year, he **pled guilty** to attempted assault in the first degree and was sentenced to 42 months' imprisonment.

o   In April 2013, GONZALEZ was arrested on charges of conspiracy in the first, second, third, and fourth degrees, stemming from the takedown of a gang known as "Tru Money." In October of that year, he **pled guilty** to second-degree conspiracy (intent to perform a Class A felony) for which he was sentenced to 4-12 years' imprisonment.

o   **GONZALEZ was received onto parole in May 2021, and the first controlled buy from him was less than a year later, in March 2022.** The CHS informed agents, in substance and part, that upon his return from prison in or about 2022, GONZALEZ began selling crack, heroin, and cocaine at the Building, and he **possessed a Glock .40-caliber pistol** (which he showed the CHS) after getting robbed near the Building.

o   On May 16, 2023, amid the ongoing and violent conflict between groups from the Johnson Houses and Jefferson Houses, GONZALEZ sent messages via Instagram to then-17-year-old IRA BOYCE, chastising BOYCE for "running" from their rivals, saying in part: "How u let n[****]s chase u[?] . . . U always doing bad[.] Fuck u running 4[?]" Although unclear what exactly precipitated this series of messages, it is obvious that GONZALEZ was angry that a younger member of his crew had run away rather than engage in violence. Just weeks later, on June 8, 2023 BOYCE did facilitate a retaliatory shooting by HOPWAH when Jefferson Houses rivals came close to the Johnson Houses.

o   In January 2024, GONZALEZ was arrested after he was observed in the Building with narcotics in plain view, then fled and threw additional narcotics in an attempt to dispose of evidence. Officers recovered approximately 41 capsules of cocaine, a plastic bag containing crack rocks, 80 decks of fentanyl, and $1,106 in cash. This arrest did not result in a conviction and was sealed.

o   In July 2024, GONZALEZ's state parole ended, meaning that he was under court supervision for all of the conduct described in the preceding four bullets. It plainly did nothing to deter GONZALEZ from participating in the charged conduct.

o   On April 4, 2025, GONZALEZ was **arrested** on narcotics charges after officers seized approximately 65 capsules of cocaine, five zips of crack, 227 glassines of fentanyl, and $1,282 in cash. **He has been released pending trial, and he was**

involved in selling fentanyl and cocaine to a UC while on release, including on **May 15, 2025**, and was present when HOPWAH sold crack to a UC on September 10, 2025—both occurring inside the Building.

2. **BRIAN NIN:**  Also 33 years old, NIN has been **arrested approximately 11 times** since September 2008 (two of which are sealed), resulting in five criminal convictions. Despite an extensive prior criminal history and while serving a term of parole, NIN made **19 sales to a UC** between August 2022 and December 12, 2025, including approximately 300 grams of cocaine base and 45 grams of fentanyl.

   o On January 5, 2010, NIN was arrested for criminal possession of a loaded firearm. He pled guilty that July and was then arrested for bail jumping in May 2011. Two months later, he was sentenced to 42 months' imprisonment.

   o Prior to sentencing on the previous case, NIN was arrested in June 2011 and charged with criminal possession of a weapon and second-degree assault, stemming from the incident described above in which GONZALEZ punched a victim on Lexington Avenue, and NIN shot the victim in the buttocks. That November, he pled guilty to attempted assault in the first degree, and the following month, he was sentenced to five years' imprisonment.

   o While serving that sentence, in April 2013, NIN was arrested for conspiracy in the first, second, third, and fourth degrees, stemming from the same Tru Money gang takedown as BRIAN GONZALEZ's April 2013 arrest (*i.e.*, they were co-defendants on the same indictment). In September of that year, he pled guilty to second-degree conspiracy, for which he was sentenced the following month to 8-24 years' imprisonment.

   o In May 2019, NIN was released and began a 16-year term of parole. Thus, all his conduct described below occurred while under court supervision.

   o In October 2020, NIN was arrested for assault after a woman accused him of punching her in the chest.

   o In February 2022 and July 2023, NIN was arrested for driving under the influence, to which he subsequently pled guilty and was sentenced to a conditional discharge and a three-year term of probation, meaning he was once again under another form of court supervision.

   o On September 23, 2023, NIN was arrested for third-degree criminal possession of a controlled substance after he was found in the Building possessing approximately 62 capsules of cocaine and 57 glassines of fentanyl. In January 2024, he pled guilty to criminal possession in the seventh degree and was sentenced to time-served.

3. **BRYAN COWAN:**  31-year-old COWAN is already **serving a five-year state sentence for attempted murder** after he stood on the corner of East 115th Street and

Park Avenue, and opened fire on rivals from the Jefferson Houses on April 28, 2023. He was arrested on August 9, 2023 (his ninth arrest), at which time law enforcement executed a search warrant at his home and found two guns, one of which had an extended magazine, and one of which was the gun fired during the April 28 incident. Even following that arrest, while awaiting his eventual guilty plea, COWAN made two sales to a UC—one of cocaine at a deli on the southern border of the Johnson Houses, and the other of fentanyl inside the Building.  Below are still images of COWAN shooting at rivals and pictures of the guns seized from his apartment.



 

4.  **JAFFARI HOPWAH:**    At just 19 years old, HOPWAH has been **arrested approximately 19 times** since September 2020 (nine of which have been sealed) for crimes including burglary, criminal possession of a firearm, and three instances of

assault on a police officer.   HOPWAH was also involved in **two broad daylight shootings** described below.

o   On May 15, 2023, an individual matching HOPWAH's physical build and distinct attire left HOPWAH's apartment building on Lexington Avenue, traveled to Brook Avenue in the Bronx; and at about 1:20 p.m., he fired multiple shots at a group of people associated with the Jefferson Houses, with a bystander just inches away from his line of fire.

 

o   Less than a month later, on June 8, 2023, rivals from Jefferson approached the Johnson Houses at about 11:45 a.m.   COWAN (**green** circle) brought a gun to BOYCE (**yellow** circle), who handed it to HOPWAH (**red** circle), who in turn walked out onto East 115th Street and Lexington Avenue to engage with the Jefferson crew (**blue** circle).   When the Jefferson rivals shot towards HOPWAH, he returned fire, aiming towards a populated streetcorner in the middle of the day.

 

 

- o After making two crack sales to an undercover officer on September 10 and 18, 2025, HOPWAH was then arrested on September 20, after he was found the previous day to be in possession of approximately 406 capsules and one plastic bag of crack and 172 glassines of suspected heroin.

5. **IRA BOYCE:** Now 20 years old, BOYCE has been **arrested seven times** (all but one being sealed), and he has been both an active dealer in the Johnson Houses, and involved in its gun activity.

- o In August 2022, BOYCE sold cocaine to one of the UCs. He was subsequently seen acting as a lookout during a buy from FARQUHARSON, and he was observed making a sale to another customer during a February 2023 UC buy.

- o In March 2023, BOYCE was arrested after he was seen engaging with a dealer during a hand-to-hand sale in the Building, then fled from police. Upon arrest, he was found to have in his possession approximately 81 capsules of cocaine. (JOSE HERNANDEZ was involved in this same arrest and was found to have approximately 55 capsules of cocaine.)

- o As noted above, on June 8, 2023, BOYCE received a gun from COWAN and handed it to HOPWAH for HOPWAH to use to confront rivals out on the street at about 11:45 a.m. HOPWAH ultimately exchanged fire with the rivals.

- o Less than a week later, on June 14, 2023, BOYCE was arrested in front of the building in possession of approximately 36 capsules of crack and 103 glassines of cocaine. (JONES was involved in this same arrest and found to be in possession of approximately 55 capsules of cocaine).

- o In November 2023, a search warrant was executed at BOYCE's home, and law enforcement found, among other things, approximately eight vials of crack. In addition, located in a box in a room that BOYCE shared with his brother (and in which his brother's identification was located), investigators found a 357 revolver, ammunition, and quantity of crack cocaine in a bedroom that BOYCE (18 years old at the time) shared with his 16-year-old brother. The firearm was in a box under the bed that BOYCE's brother was lying on; also in the box were approximately five VISA credit/debit cards in BOYCE's brother's name and a sixth card in the name "Buggout," suggesting that all the cards were fraudulent.

- o Most recently, in March 2025, BOYCE was arrested after he had been observed two days earlier discarding approximately 68 vials of cocaine and 109 glassines of fentanyl while fleeing from the police.

6. **JOSE HERNANDEZ:** In 2023, the CHS reported that months earlier, while sitting on a bench in the Building courtyard, HERNANDEZ **showed the CHS that he had a .380-caliber pistol** and said, in sum and substance, that they "gotta be on point" and that he was "out here with it" (referring to the firearm). That is, HERNANDEZ was suggesting that he needed to be ready to defend the Johnson territory from rivals. In addition to possessing a firearm, HERNANDEZ has been arrested twice (both now sealed):

- o On June 1, 2020, at about 8:00 p.m., HERNANDEZ was arrested with about two dozen other people for burglary and incitement after they forcibly broke into the Herald Square Foot Locker store during a night of significant protest and looting activity. *See* Christina Goldbaum et al., "After Peaceful Protests, Looters Strike at Macy's and Across Midtown," NY Times (June 2, 2020).[10]

- o In March 2023, HERNANDEZ was arrested after he was observed making a hand-to-hand drug sale and was then found to be in possession of approximately 55 capsules of cocaine. BOYCE was also arrested in connection with this event and his possession of approximately 81 capsules of cocaine.

7. **DANIEL JONES:** On September 22, 2020, JONES was arrested for possessing a loaded Glock pistol about two weeks earlier on the corner of Park Avenue and East 116th Street (one block north of the Johnson Houses). The case was subsequently sealed. By 2022, he was fully engaged in the Johnson Houses narcotics business, acting as a lookout during a UC buy in March and then seen selling to another customer while a UC bought from BOYCE in August. The following year, in June 2023, JONES was arrested with BOYCE in front of the Building, where he was found to be in possession of approximately 97 capsules of cocaine.

8. **JAHDEEN WILLIAMS:** At 34 years old, WILLIAMS has been **arrested approximately 23 times** (about 18 of which are sealed) dating back to March 2023,

---

[10] https://www.nytimes.com/2020/06/02/nyregion/nyc-looting-protests.html./

and he has accumulated approximately 22 bench warrants dating back to August 2013. The vast majority appear to be for drug possession, petit larceny, and burglary-related offenses; and they have occurred across at least three boroughs (Manhattan, the Bronx, and Brooklyn). Despite this extensive history of law enforcement contact, WILLIAMS has continued to sell narcotics in the Johnson Houses, including approximately seven times to a UC since January 28, 2025. He has also been observed selling to another customer, and has been present for about six other buys, acting as a lookout during several of them. In addition, of all the defendants, WILLIAMS is the one observed most often accessing the utility box on the first floor of the Building where it appears he consistently stored drug product.

9. **RICHARD FARQUHARSON:** 35-year-old FARQUHARSON was known by the CHS to reside on the first floor of the Building as of 2023 and to allow GONZALEZ to sell narcotics out of his apartment. FARQUHARSON also made approximately six of his own sales to a UC between May 2022 and January 2025, confirming his longtime participation in the charged conspiracy. He did so after sustaining four prior arrests two of which were sealed, and two of which were for possession of weapons:

   o In March 2012, FARQUHARSON was arrested at a corner on the southern border of the Johnson Houses for possessing a razor knife.

   o In February 2013, FARQUHARSON was arrested for armed robbery after he and another man stole a victim's cellphone at gunpoint.

10. **PERCY CARRION:** On September 4, 2025, police on patrol in the Building encountered CARRION in a stairwell between the second and third floors. There they saw him manipulating items in a utility box affixed to the wall, then as the officers approached, he locked the box and fled. Inside the box were approximately 164 glassines (3.542 grams) of fentanyl, 350 vials (14.665 grams) of cocaine, and 64 vials (24.543 grams) of cocaine base. In addition, there was a loaded .380-caliber pistol, additional .380 ammunition, and bags of syringes. Images of the drugs, syringes, and firearm seized are below:

 

 

o CARRION was arrested by federal law enforcement officers for this incident in mid-October, but between the time federal law enforcement encountered him on September 4, 2025 and his federal arrest about six weeks later, CARRION made a crack sale to one of the UCs at the Johnson Houses' communal playground (working with HOPWAH to do so).

11. **CAESAR HERNANDEZ:**  At 34 years old, CAESAR HERNANDEZ has been arrested eight times (five of which are sealed), and he has sustained three convictions, all of which predate his sales to a UC at the Building.

o In September 2009, CAESAR HERNANDEZ was arrested for possessing a loaded 9-millimeter Highpoint firearm.  He **pled guilty** about a year later to attempted criminal possession of a loaded firearm, and was sentenced in October 2010 to two years' imprisonment.

o In January 2015, he was arrested for criminal possession of a controlled substance after he was observed making a hand-to-hand drug sale and then found to be in possession of a controlled substance.  He **pled guilty** that June and was sentenced in October to a term of one year in prison.

o In November 2021, he was arrested again following a car stop during which he was found to be in possession of about two bundles of heroin.  He **pled guilty** the following month to criminal possession of a controlled substance, and the same day, he was sentenced to time served.  In addition, his passenger in the car—another Johnson Houses associate—fled from the car and was found to be in a possession of a firearm when officers apprehended him.

o Following these arrests and convictions, CAESAR HERNANDEZ became an active member of the charged conspiracy who, according to the CHS, both sold cocaine and had others in the Building work for him making sales.  UC buys in May 2023 and January 2024 corroborated that HERNANDEZ also made sales of his own.  In the first of these transactions, HERNANDEZ sold a substance that

include metonitazine (a synthetic opioid that may be even more potent and dangerous than fentanyl), and in the second, he sold the UC fentanyl and cocaine. The dangers of drug use and addiction are also well known to HERNANDEZ, as demonstrated by his Instagram posts in 2025 mourning the death of an individual who died in the Building of a suspected drug overdose, including one picture of the man in the same Building lobby where all of the defendants pushed their product.

 

12. **QUADIR DAVONISH:**  From June 2022 into at least early-2025, DAVONISH has been in the Building lobby, congregated with co-conspirators as they made sales to one of the UCs.  In addition, DAVONISH himself sold fentanyl to a UC on January 17, 2025.  During the transaction, DAVONISH also asked the UC if all he wanted was "straight down" (referring to fentanyl), suggesting that DAVONISH also had cocaine and/or crack available for sale had the UC asked for that as well.  DAVONISH has also sustained two arrests—one for an act of violence and one for drug possession:

o   In June 2020, was arrested for **punching a 65-year-old man** while the man was riding a bicycle near the southern border of the Johnson Houses, causing the man to fall and sustain injuries.  The case was subsequently sealed.

o   In March 2025, DAVONISH was arrested for possessing suspected codeine/promethazine, a controlled substance in a cough syrup commonly mixed with other ingredients to create a recreational drug/drink called "lean" that users frequently keep in a baby bottle.  It appears that DAVONISH received a Desk Appearance Ticket, and the case was subsequently sealed.

Based on these histories of law enforcement encounters, convictions, gun possession, and violence, it is clear that mere arrests, pending cases, and court supervision do nothing to stop the defendants from defiling the Johnson Houses and placing members of their community in danger. The Bail Reform Act therefore requires that they be detained pending trial.

Not to be lost in the discussion of individual pieces of evidence is the sweeping and devastating human toll that this conspiracy has inflicted on residents of the Johnson Houses day after day. Videos of the undercover buys show residents—men, women, and children—navigating through the Building lobby and courtyard while defendants in this case sling bags of crack, cocaine, and fentanyl just feet away. One video shows a resident enter the Building stairwell with a full trash bag that she intends to bring downstairs and throw out; but upon seeing WILLIAMS serving the UC at the bottom of the stairs, she turns back onto the second floor and walks away. A older woman's dog is heard barking as the UC and other customers gather near the door and then shuffle past the elevator after buying from JOSE HERNANDEZ. School children in backpacks come and go. A family that lives on the first floor has to step around a chair that NIN, HOPWAH, and others set up just feet away from their apartment, and the residents of that apartment no doubt listen to drug deals all day long. COWAN, FARQUHARSON, BOYCE, DAVONISH, and others crowd the lobby and stairs holding fanny packs full of potentially lethal fentanyl (not to mention the even more dangerous nitazenes NIN and CAESAR HERNANDEZ sold). GONZALEZ accesses mailboxes as if they were his own. On a comfortable afternoon in September 2025, instead of children playing on the playground, HOPWAH and CARRION are counting money and handing out crack; and on a warm night in August 2022, instead of residents comfortably relaxing on the Building's courtyard benches, the area is filled with defendants and drug customers as BOYCE, JONES, NIN, COWAN, and others make sales.

Below are just a few frames from the UCs' recordings, which help to visualize the day-to-day experience around the Building, with the defendants' business a constant reality throughout.

**GONZALEZ and CAESAR HERNANDEZ waiting for customers at the front door.**



**BOYCE, COWAN, and FARQUHARSON selling in the lobby as
two children wait for the elevator.**



**NIN and WILLIAMS set up shop at the bottom of the stairs near the back door**.



**HOPWAH stands atop the jungle gym and sells with CARRION.**



**NIN meets customers in the dark stairwell on the 8th floor.**



**GONZALEZ, NIN, COWAN, BOYCE, and JONES sell from the benches in the courtyard.**



These conditions would not be tolerated in most privileged neighborhoods and buildings across the city. All levels of government and courts should find them equally intolerable in the Johnson Houses. Individuals like the defendants, who have repeatedly demonstrated a willingness to risk the lives of innocent residents—even while under court supervision and despite numerous prior arrests, convictions, and prison sentences—must be detained pretrial under the dictates of the Bail Reform Act.

## IV.    Application of the Bail Reform Act

A mandatory presumption "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community" applies, as here, when a defendant is charged with (i) a controlled substance offense with a maximum term of imprisonment that is greater than ten years and (ii) an offense under 18 U.S.C. § 924(c). 18 U.S.C. § 3142(e)(3). The defendants bear the burden of producing evidence to rebut the presumption, and the Government anticipates they will not be able to do so considering the facts set forth above. *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001). Moreover, even if a defendant satisfies the initial burden of rebutting the presumption, the presumption still does not vanish entirely; it "remains a factor to be considered among those weighed by the district court." *Id.*

When determining whether there are conditions that can protect the community and ensure the defendants' appearance in court, the Court "shall . . . take into account" (1) "the nature and circumstances of the offenses charged"; (2) "the weight of the evidence against" each defendant; (3) each defendant's history and characteristics, including among other things (A) his "past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings" and (B) whether the defendant engaged in the offense while "on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law"; and (4) "the nature and seriousness of

the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g).

In this case, as set forth at length above, the nature and circumstances of the offenses are profound in that the defendants' conduct has negatively impacted the lives of countless people who have been forced to coexist with a brazen drug distribution operation in the very Building they call home, and they have been placed at risk by the drugs, guns, and violence that follow. The evidence against each defendant is irrefutable: they are all on video selling drugs, working with one another, in the same Building and immediately surrounding area over the course of years. Several have been arrested with drugs or guns.  Some are on video arming one another or committing shootings.  And because this evidence is so strong—and the defendants are facing mandatory minimum sentences of at least 15 years (which is by far the most serious sentence most of them have ever faced)—their incentives not to appear for court are great.[11]  Finally, certain of the defendants committed the offense conduct while already under some degree of court supervision, including while on release with charges pending.  Even if those charges did not result, or have not yet resulted, in convictions, those defendants' continued participation in the charged conspiracy, regardless of past arrests, convictions, and/or sentences, demonstrates the inadequacy of court supervision in this case.

As noted above, in the event that Pretrial Services ("Pretrial") recommends release on conditions for any defendant, the Court should give that recommendation limited weight because Pretrial's recommendation is based on incomplete information, in that it does not consider several of the factors that weigh most heavily in favor of detention and that the Court is obligated to consider under the Bail Reform Act.[12]  Specifically, Pretrial *does not consider*:

1.  The underlying facts or circumstances of the charged offense conduct, including any information that could be proffered by the Government, or even the details alleged in the, regardless of that information's reliability.  *See* 18 U.S.C. § 3142(g)(1), (4).

2.  The weight of the evidence, even if it is clear from the face of the charging document or other Government pleading.  *See* 18 U.S.C. § 3142(g)(2).

3.  The potential penalties a defendant faces if convicted, including the Sentencing Guidelines, even when they create an incentive for the defendant to flee or otherwise

---

[11] Although the phrase "risk of flight" is often used in this context, the Bail Reform Act stresses the need to evaluate whether conditions exist that will "assure the appearance of the person."  *See, e.g.*, § 3142(e)(3).  In a populous and dense city like New York, defendants may not appear—and may in fact be very hard to locate—without ever leaving their own neighborhoods.

[12] The Government understands that Pretrial's approach to bail recommendations is consistent with policies promulgated by the Administrative Office of the United States Courts, and that Pretrial may favor this approach for institutional and/or resource-based reasons.  The Government also recognizes Pretrial's time and diligence in preparing Pretrial Reports, including the collection of information relating to the defendant's background.  That information, to the extent accurate, has some value.  Under the Bail Reform Act, however, the Court's decision must be informed by a broader set of information and factors—several of which are material here.

not to appear for future court proceedings. *See United States v. English*, 629 F.3d 311, 318 (2d Cir. 2011) (a high mandatory minimum sentences creates an incentive to flee).

4. The underlying facts or circumstances of the defendant's past conduct and/or prior crimes, even if they resulted in convictions. *See* 18 U.S.C. § 3142(g)(3)(A).

5. The statutory presumption that no condition or combination of conditions will reasonably assure the defendant's appearance or the safety of the community. *See* 18 U.S.C. § 3142(e)(3).

Pretrial's recommendation is instead based almost entirely on the defendant's personal history and characteristics, *see* 18 U.S.C. § 3142(g)(3), most of which typically favor the defendant's request for release, especially because they are often self-reported by the defendant and largely only corroborated, if at all, by the defendant's own family members, who may have self-interests. The Court, however, is statutorily required to consider *all* the additional factors that Pretrial omits from its analysis, including ones set forth above that weigh heavily in favor of detention.

\*          \*          \*

Based on all the facts set forth above, the Government respectfully submits the defendants are unable to rebut the presumption that there are no conditions that will reasonably assure the safety of the community and the defendants' appearances in Court if any are released. Accordingly, they should be detained pending trial.

Respectfully submitted,

JAY CLAYTON
United States Attorney
Southern District of New York

By: _____
Frank Balsamello / Diarra Guthrie
Assistant United States Attorney
(212) 637-2325 / -2463

cc:    All counsel of record (by email)
       Pretrial Services (by email)